# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

| | |
|---|---|
| **MICHAEL ROTHENBERG and MATTHEW FERGUSON,** )<br>**Plaintiffs,** )<br>**vs.** )<br>**PB TRADING, SA; RALPH COHEN, Sr.; RALPH COHEN, Jr,; ROY LAUES-GHOLSTON; NORTHERN RIDGE CAPITAL PARTNERS, LLC; AYANNA JAMES; WILSON CAPITAL HOLDINGS, LLC; WCG-NRC LIMITED PARTNERSHIP LTD; WENDELL INNIS; PARMJIT SINGH SAUND;** )<br>**Defendants.** ) | **CASE NO. _____**<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **RICO;**<br>2. **FRAUD, GENERALLY;**<br>3. **SECURITIES FRAUD;**<br>4. **FEDERAL MAIL FRAUD;**<br>5. **FEDERAL WIRE FRAUD;**<br>6. **CONSPIRACY;**<br>7. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>8. **UNJUST ENRICHMENT;**<br>9. **FALSE LIGHT PRIVACY;**<br>10. **BREACH OF CONTRACT** |

_____

## I.      INTRODUCTION AND PRELIMINARY STATEMENTS

Plaintiffs sue the Defendants set forth above for the violations of several Federal and state laws, Civil Rico; the Federal Mail Fraud Act, 18 U.S.C § 1341 (the "Mail Fraud Act"); the Federal Wire Act, 18 U.S.C. § 1343 (the "Wire Act"); the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; the Securities Act of 1933 15 U.S.C § 77a *et seq.* (the "33 Act"), and Rules promulgated thereunder by the Securities and Exchange Commission ("SEC"); and for violations of several state and federal and laws.

## II.     THE PARTIES

### A.  The Plaintiffs

Plaintiff ROTHENBERG is an individual residing in the State of Georgia and is a member in good standing of the State Bars of Georgia and New York. ROTHENBERG is also admitted to practice before this Court.

Plaintiff FERGUSON is an individual residing in the County of Cook, State of Illinois and for the purposes of this action, voluntarily submits himself to the jurisdiction and venue of this Honorable Court. The acts committed against this Plaintiff arise out of the same transaction and are part of the same case and controversy as the acts committed against Plaintiff ROTHENBERG.

### B.  The Defendants

1.     Defendant **ROY LAUES-GHOLSTON** (also known as Roy Laues) (hereinafter "Laues") is, upon information and belief, a resident of Canton, Michigan. At all relevant times, Laues was a managing member of Northern Ridge and a general partner of WCG-NRC. Laues also held himself out as a Member and Vice- President of WCG. Laues served as a conduit between Plaintiffs on the one hand, and Defendants WCG, WCG-NRC, Northern Ridge, PB Trading, the Cohens and Ayanna James on the other.

2.     Defendant **NORTHERN RIDGE CAPITAL PARTNERS, LLC** (hereinafter "Northern Ridge"), is a limited liability company organized under the laws of the State of Ohio, with its principal place of business in Toledo, Ohio. Upon information and belief, Northern Ridge conducts business in Georgia, Florida and various other states. At all material times, Northern Ridge held itself out as a loan underwriter and processor with over $900 Million in available investment funds.

3.     Defendant **AYANNA JAMES** (hereinafter "James") is, upon information and belief, a resident of Norfolk, Virginia. At all relevant times, James was and continues to be a Member of Defendant WCG and one of its Managers, and acts and continues to act as WCG's Registered Agent domiciled in Winter Park, Florida. James acted or purported to act on behalf of WCG after WCG had

been administratively dissolved. James also was at all relevant times a General Partner of Defendant WCG-NRC Limited Partnership, Ltd., which is identified in detail below.

4. Defendant **WCG-NRC LIMITED PARTNERSHIP LTD.** (hereinafter "WCG- NRC") is a limited partnership organized under the laws of the State of Florida, with its principal place of business located in Orlando, Florida. WCG-NRC is composed of two general partners: (i) defendant James; and (ii) defendant Roy Laues- Gholston, who is identified in detail above. WCG-NRC allegedly was created as a special purpose entity to hold WCG's and Northern Ridge's resulting interest in the financing operation that is the subject of this action.

5. Defendant **WILSON CAPITAL HOLDINGS, LLC** (also known as Wilson Consulting Group, LLC and Wilson Capital Group, LLC) (hereinafter "WCG") is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Winter Park, Florida. WCG also maintains its Registered Agent in Winter Park, Florida. According to public records, on September 24, 2010, WCG was administratively dissolved by the Florida Department of State, Division of Corporations, for failure to file an annual report. Nevertheless, at all material times, WCG held itself out as a private equity firm with over $500 Million in available investment funds.

6. Defendant **PB TRADING, SA** is a for profit company believed to be operating in the Netherlands, Spain and Argentina. Upon information and belief, this defendant is a part of, owned by and is a front/shell organization for the activities of ABN AMRO.

7. Defendant **RALPH COHEN Sr.** is an Argentine national and owner and founder of PB Trading, SA. His current whereabouts are unknown to the plaintiffs.

8. Defendant **RALPH COHEN Jr.** is an Argentine national and owner and principal of PB Trading, SA. He holds and Italian Passport. His current whereabouts are unknown to the plaintiffs, but he is believed to be hiding in Argentina.

9. Defendant **WENDELL INNIS** is a British National whose exact whereabouts are currently unknown to the plaintiffs.

10. Defendant **PARMJIT SINGH SAUND** is a British National of Indian decent whose exact whereabouts are currently unknown to the plaintiffs.

11.     This is an action for damages far in excess of $75,000 exclusive of interest and costs.

## III.    JURISDICTION and VENUE

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332; 18 U.S.C § 1961 et seq.; 18 U.S.C. §§ 1341, 1343, 1010 et seq.; 15 U.S.C. § 77a, et seq. Venue is proper before this Court.

## IV.    FACTS COMMON TO ALL COUNTS

The issues outlined and challenged by this Complaint seem complicated but are in fact very simple.  Defendants, and each of them, participated in a racket to defraud these plaintiffs and others presently unknown to these plaintiffs.

1. At all times pertinent hereto, Plaintiff FERGUSON's main business was commodities, i.e. the purchase and sale of items such as fuel, sugar and related goods.

2. In 2009, Plaintiff FERGUSON sought funding for several transactions in which he wished to engage.

3. Plaintiff FERGUSON came into contact with Defendant INNIS, who repeatedly promised FERGUSON that INNIS was ready, willing and able to secure for FERGUSON a line of credit, or a credit type facility at a major international bank which would allow FERGUSON to be able to enter into, and fulfill contracts for his business.

4. Defendant INNIS introduced FERGUSON to Defendant SAUND, a fellow Englishman, and told FERGUSON that SAUND owned many of the gas stations in ENGLAND and had, through his family, multiple connections at major banks including HSBC, Lloyds, and specifically ABN AMRO.

5. Both Defendants INNIS and SAUND promised to make the arrangements for the credit facility for FERGUSON in return for a monetary fee, payable to INNIS and

SAUND and a percentage of the credit line once activated, also payable to INNIS and SAUND. These defendants promised FERGUSON that they had banker connections inside ABN AMRO that would ensure the credit facility was established properly.

6. These defendants further promised FERGUSON that they would facilitate the opening of a bank account for him overseas, despite the fact that FERGUSON is American and it is difficult to open overseas accounts for Americans. These defendants charged FERGUSON a fee for that service.

7. Towards the end of 2009, FERGUSON hired Plaintiff ROTHENBERG as his attorney to specifically negotiate for the alleged opening of his line of credit. FERGUSON had previously hired ROTHENBERG to represent him on other legal matters, which ROTHENBERG did successfully.

8. To that end, and as instructed by FERGUSON, ROTHENBERG filed for the incorporation of FERGUSON'S commodities company in Delaware. ROTHENBERG filed the appropriate paperwork for registration, opened the corporate bank accounts, and then turned the company over to the control of FERGUSON.

9. Plaintiffs ROTHENBERG and FERGUSON continued to negotiate with these defendants in good faith, and were promised by Defendants INNIS and SAUND that FERGUSON's credit line at ABN AMRO would be opened and activated shortly.

10. In January 2010, Defendant INNIS reported to FERGUSON that his credit line was active at ABN AMRO. Defendant INNIS asked for FERGUSON's banking coordinates and, because FERGUSON trusted defendant INNIS, FERGUSON sent that information to him.

11. In February 2010, Defendant INNIS told FERGUSON that he needed to travel to England to sign the paperwork and to receive the first "draw" on the line of credit.

FERGUSON made arrangements for his attorney ROTHENBERG to travel to England to comply with this request.[1] ROTHENBERG was set to go to England and receive the money at the beginning of March 2010.

12. At the end of February 2010, a company named Winterhawk Energy approached ROTHENBERG and requested his assistance in locating financing for their energy company. ROTHENBERG discussed this request with FERGUSON. FERGUSON in turn discussed it with Defendants INNIS and SAUND who assured him that his credit line at ABN AMRO was open, along with his bank account in England, and all that was required was a trip to England to sign off on the "draw".

13. Defendant INNIS told FERGUSON that to increase his credit line already in place would require a fee of $1.35 Million Dollars.

14. Based on these promises, and relying on the same, FERGUSON authorized ROTHENBERG to draft a contract between FERGUSON's company and Winterhawk agreeing to the deal. Winterhawk would pay the fee for the increase in credit line and in return would receive cash from FERGUSON's company.[2]

15. Prior to the signing of the contract with Winterhawk, ROTHENBERG followed up with Defendant INNIS who repeated his promise he had made to FERGUSON and assured ROTHENBERG that the credit line existed to fulfill FERGUSON's company's contract with Winterhawk and any other deal FERGUSON wished to enter.

16. Following the signing of the contract between Winterhawk and FERGUSON's company, ROTHENBERG did in fact travel to England for the pre-scheduled

---

[1] This was done for two reasons: firstly, because FERGUSON wanted his attorney there and second because FERGUSON has a fear of flying and could not make the trip himself.

[2] The events surrounding this contract lead to Winterhawk filing suit against Rothenberg and Four Five, LLC – Ferguson's Company - in November 2010, and to the entry of a judgment against Plaintiffs Rothenberg and Four Five, LLC. At the time of the judgment, and subsequent SEC investigation, the plaintiffs had not yet discovered the extent of the Defendants' fraud.

meeting with Defedants INNIS and SAUND. At the set time for the meeting, ROTHENBERG appeared but INNIS and SAUND were nowhere to be found.

17. When confronted by Plaintiffs ROTHENBERG and FERGUSON about their no-show, Defendants INNIS and SAUND made excuses for why they did not show and promised to rectify the situation without the need for a return trip by ROTHENBERG to England.

18. During the subsequent months and into the summer of 2010, Defendant INNIS repeatedly promised the plaintiffs that the credit line was active and would be "draw-able" shortly, always using delay tactics and outright lies as an excuse.

19. To further perpetrate this fraudulent scheme, Defendant INNIS had his "associates" contact ROTHENBERG and FERGUSON to assure them that nothing was wrong, and that FERGUSON would be funded imminently. These "associates" produced fraudulent documents to ROTHENBERG and FEGRUSON in an effort to assuage and assure them that nothing was wrong.

20. None of Defendant INNIS' so-called associates told the truth at all; they lied to continue perpetrating the fraud against ROTHENBERG and FERGUSON. Upon information and belief, these "associates" used aliases and fake personages/e-mail accounts at the direction of INNIS.

21. During this time, Plaintiff FERGUSON repeatedly attempted to contact Defendant SAUND but was unsuccessful.

22. Towards the end of Summer 2010, Defendant INNIS informed FERGUSON that Defendant SAUND was no longer working with him. Defendant INNIS told FERGUSON that another group of "associates" was taking over the responsibility of funding FERGUSON.

23. Defendant INNIS told FERGUSON that the new group's representative in the United States was "Roy"; this "Roy" is the defendant ROY LAUES-GHOLSTON (hereinafter "LAUES").

24. Defendant LAUES did contact ROTHENBERG and FERGUSON during the end of Summer 2010. Defendant LAUES claimed he owned his own company, Defendant NORTHERN RIDGE CAPITAL PARTNERS, LLC (hereinafter "NORTHERN RIDGE") and that his company was part of a partnership with Defendant AYANNA JAMES and her company, Defendant WILSON CAPITAL HOLDINGS, LLC   (hereinafter "WILSON CAPTIAL"). Together, the two companies were in a partnership known as Defendant WCG-NRC LIMITED PARTNERSHIP LTD. (hereinafter "WCG"). The plaintiffs collectively refer to these defendants as the "Laues Defendants" for clarity.

25. Defendant LAUES, speaking for all the Laues Defendants, assured Plaintiffs ROTHENBERG and FERGUSON that they had expertise in sophisticated forms of international financing, such as the one at issue, and that WCG and Northern Ridge had the financial ability to undertake the promised transaction.

26. In furtherance of these representations, LAUES and JAMES, on behalf of WCG and NORTHERN RIDGE, provided Plaintiffs with knowingly false written confirmations from WCG and NORTHERN RIDGE, respectively, of those entities' financial solvency. LAUES assured ROTHENBERG that WCG had in excess of half a billion dollars in investment funds. This was a lie.

27. Defendant LAUES further told ROTHENBERG that he was the United States representative of Defendant PB TRADING, SA, a company owned by the Defendants COHEN.

28. Defendant LAUES told ROTHENBERG that Defendants COHEN and PB TRADING had the sum of $4.5 Billion Dollars at PB TRADING'S account at ABN AMRO Bank in the Netherlands.

29. Unbeknownst to plaintiffs ROTHENBERG and FERGUSON at the time, the Laues defendants, led by Roy Laues himself, contacted nearly two dozen other entities and individuals, promising to provide each of them with a 500 Million

Euro financial instrument from ABN AMRO which LAUES represented could be used to fund various businesses in the United States and throughout the world.

30. LAUES, speaking for the Laues Defendants, made the same representations to many other people and companies that he made to ROTHENBERG and FERGUSON.

31. These representations included that the Laues Defendants had expertise in sophisticated forms of international financing, such as the one at issue, and that WCG and Northern Ridge had the financial ability to undertake the promised transaction.

32. The Laues Defendants further extracted fees and money by fraud and deceit from FERGUSON and attempted to steal further funds in the form of post transaction "processing fees" which approached $91 Million euros, along with another $1 Million euro fee to be paid after "delivery" of the credit facility or "instrument" as LAUES described.

33. None of the plaintiffs were aware that the Laues Defendants, as part and parcel of their scheme to defraud, had promised the same credit facility or "instrument" not only to ROTHENBERG/FERGUSON but also to many other individuals and businesses around the country and throughout the world.

34. Because of these events, Plaintiffs ROTHENBERG and FERGUSON began to compare notes, share information and worked together with other victims to ensure the defendants complied with their obligations.

35. In furtherance of their fraudulent representations, Defendants LAUES and the COHENs showed ROTHENBERG, via e-mail, a document purported to be a bank statement from ABN AMRO showing that the COHENS/PB TRADIING did have $4.5 Billion Dollars in the account. A true and correct copy of this document, properly redacted to comply with Local Rules, is attached hereto as Exhibit "A".

36. Upon information and belief, this document was fraudulent and forged by the Laues/Cohen Defendants.

37. Contemporaneous to these actions, the LAUES defendants made similar promises to other individuals using the exact same documents.

38. The LAUES defendants further perpetrated this same scam and fraud upon numerous other victims, some known and some unknown. The LAUES Defendants took nearly $1.5 Million Dollars from a publicly traded Spanish company named NYESA.

39. NYESA has filed suit against the LAUES Defendants in the Southern District of Florida[3] for their having fallen victim to the same fraudulent scheme.

40. As a result of falling victim to these defendants' fraudulent acts, upon information and belief, NYESA's stock has been devalued in the amount of approximately $54 Million Dollars, its directors' reputations destroyed, and its projects left unfunded to the tune of $300 Million Dollars.

41. Contemporaneous to these actions, and unknown to the plaintiffs herein, the LAUES defendants perpetrated the same fraudulent scheme upon other victims, namely First Capital Investment Holdings and Sirak, LLC. Both of these victims, who are unrelated to these plaintiffs, have previously filed suit against the same defendants. That case is currently pending.[4]

42. Upon information and belief, there are many other victims of these defendants who have yet to file suits or discover these defendants' fraud.

43. Following the furnishing of the fraudulent bank statement, the LAUES Defendants, in concert with Defendants the COHENs and PB TRADING produced a letter of credit from ABN AMRO, purportedly signed by bank officers

---

[3] The case is NYESA COSTA RICA, et al v. WILSON CAPITAL GROUP HOLDINGS, LLC, et al, United States District Court for the Southern District of Florida, Case No. 1:11-cv-22036, currently pending.

[4] The case is FIRST CAPITAL INVESTMENT HOLDINGS, et al v. WILSON CAPITAL GROUP, et al, United States District Court for the Southern District of New York, Case No. 1:10-cv-02948, currently pending.

COMPLAINT FOR DAMAGES

of ABN AMRO, all of which were employees acting within the course and scope of their employment with ABN AMRO.

44. A true and correct copy of this bank instrument, properly redacted to comply with Local Rules, is attached hereto as Exhibit "B".

45. These defendants addressed the letter of credit to Plaintiff ROTHENBERG. Despite repeated requests, the defendants refused to allow ROTHENBERG, or any other plaintiff, to contact the bank to verify the validity of this letter.

46. A representative of another victim did however make contact with someone purporting to be MARTEEN MOL, an ABN AMRO bank official, who advised that no one in the bank had signed this bank letter but refused to assist Plaintiffs further. Upon information and belief, ABN AMRO knew, or should have known, of their employee's potential involvement in the fraud and the fraud of others, yet chose to do nothing about it.

47. Upon being confronted with this information, the LAUES Defendants, along with Defendants COHEN and PB TRADING made repeated false and fraudulent representations to assure the plaintiffs that the credit facility was valid and ready to be transferred to the plaintiffs.

48. None of the plaintiffs' bankers were able to obtain possession or control over the credit facility, despite repeated attempts.

49. A person purporting to be Arthur Martinez, holding himself out as Chairman of ABN AMRO, wrote an e-mail explaining that further money was needed to complete the transaction.

50. At various times during the fall of 2010, the defendants attempted to extort various sums of money from each of the plaintiffs, ranging from $300,000 Euros to several million Euros.

51. The defendants told the plaintiffs, and specifically ROTHENBERG, that these fees needed to go into a separate account owned by Defendant COHEN. Later, the

defendants stated the fees needed to go to banker Arthur Martinez personally in an account in Miami.

52. When this scheme failed to produce the desired results, the defendants offered to place the aforementioned bank letter onto the Depository Trust Clearing Corporation (DTCC) system in order to be verified by the plaintiffs' bankers.

53. The defendants reported to plaintiff ROTHENBERG that the banking letter was viewable on the DTCC system. The defendants even produced a receipt from DTC which they claimed corroborated their story.

54. The defendants informed the plaintiffs that an employee banker of ABN AMRO placed the document on the DTC system from inside ABN AMRO's branch in the Netherlands, as only bankers had access to the system and the ability to post to the site. The defendants informed the plaintiffs that this employee was ABN AMRO employee Michael Van Der Mueller.

55. Upon information and belief, the aforementioned receipt was fraudulent and forged by the defendants.

56. A true and correct copy of the purported DTC receipt, properly redacted to comply with Local Rules, is attached hereto as Exhibit "C".

57. The defendants continued to make false representations to the plaintiffs throughout the remainder of 2010 and into 2011.

58. The defendants attempted to extort money from these plaintiffs by refusing to allow the transaction to be completed without payment, despite earlier claims to the contrary.

59. Despite multiple pleas from Plaintiff ROTHENBERG and FERGUSON to the defendants, the defendants failed to perform as agreed.

60. The defendants submitted further fraudulent documents to the plaintiffs in the form of another bank letter allegedly signed by Arthur Martinez and Marteen Mol while in the course and scope of their employment with ABN AMRO.

61. When confronted by the plaintiffs and asked to provide proof of the letter's validity, the defendants resubmitted the same letter with different signatures. Upon information and belief, both of these letters were fraudulent.

62. True and correct copies of these letters, properly redacted to comply with Local Rules, are attached hereto as Exhibit "D".

63. The plaintiffs further pressed the defendants to speak to their bankers at ABN AMRO. The defendants submitted false e-mail addresses to the plaintiffs, so the plaintiffs could not speak to anyone at ABN AMRO.

64. Plaintiffs, working with another victim of the scam, had a lawyer from the Netherlands attempt to make an appointment with ABN AMRO to discuss the multitude of fraud emanating from the bank, but the bank refused to meet with the lawyer.

65. Following these events, the defendants ceased contact with these plaintiffs and have never made good on their multitude of false and fraudulent promises

66. Many fraudulent acts took place here. Like an orchestra that has been perfectly choreographed and through the help of their aiding and abetting associates and acting with MALICE AFORETHOUGHT, these Defendants continue to target unsuspecting victims the world over to the present day.

67. These defendants operated both a Ponzi scheme and a prime bank scheme, in that the scheme needed a continuous stream of investors to be kept alive and the scheme involved the use, possible sale, lease or delivery of so called banking instruments from ABN AMRO, which these defendants knew either did not exist or had no intention of delivering.

68. Unlike many Ponzi and prime bank schemes, which target the most vulnerable members of our society, this scheme specifically targeted professionals and heads of businesses, as the defendants acted in a manner that they thought would deter these professionals, such as the plaintiffs here, from discovering or revealing the

fraud; by making the plaintiffs seem like the bad actors to their respective clients or business associates, the defendants believed these plaintiffs would not be able to recover from their damaged reputations and would not pursue them.

69. The defendants were wrong. This scheme was very difficult to decipher, but these plaintiffs refuse to stand idly by while the perpetrators of fraud attempt to leave broken reputations, broken businesses and emptied bank accounts in their wake.

70. Because of the intentional acts of the defendants, and each of the, Plaintiff ROTHENBERG has suffered damages in an amount to be proven at trial. The defendants' actions were the direct sole and proximate cause of the lawsuit filed against ROTHENBERG resulting in a judgment of one and a half million dollars.

71. Plaintiff ROTHENBERG suffered damage to his reputation and good name at the hands of the actions of these defendants. Plaintiff ROTHNENBERG lost his election for judge in 2010 due to the false, embarrassing and humiliating false light privacy violation he suffered at the hands of these defendants.

72. Because of the intentional acts of the defendants, and each of the, Plaintiff FERGUSON has suffered damages in an amount to be proven at trial. The defendants' actions were the direct sole and proximate cause of the lawsuit filed against FERGUSON's company resulting in a judgment of one and a half million dollars.

73. Plaintiff FERGUSON suffered the destruction and loss of his commodities business, lost and broken contracts he could not meet due to the defendants' fraud, and contractual commissions totaling over ten (10) million dollars that he would have received from commodities transactions, but for the actions of these defendants. Plaintiff FERGUSON further suffered damage to his reputation and good name at the hands of the actions of these defendants.

**V.     CAUSES OF ACTION**

## COUNT ONE:

Acquisition and Maintenance of an Interest in and Control of
an *Enterprise* Engaged in a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(b)

1.      Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

2.      At various times and places all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

3.      During the ten (10) calendar years preceding the date of filing of this case, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

4.      Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

5.      *Respondeat superior* applies to these defendants in each regard where appropriate.

## COUNT TWO:

Conduct and Participation in a RICO *Enterprise*
through a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(c)

6.      Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

7.      At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

8.      Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

9.      During the ten (10) calendar years preceding the filing of this suit, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

10.      Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

11.      Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  *Respondeat superior* applies to these defendants in each regard where appropriate.

## COUNT THREE:
Conspiracy to Engage in a
*Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(d)

12.     Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

13.     At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

14.     At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).  See also 18 U.S.C. §§ 1961(4), (5) and (9).

15.     During the ten (10) calendar years preceding the filing of this suit., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

16.     Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

17.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  *Respondeat superior* applies to these defendants in each regard where appropriate.

18.     These defendants, and each of them, have further violated 18 USC 891-984 Extortinate credit transactions;   1341 mail fraud, 1343 wire fraud, 1344 financial institution fraud, 1503 obstruction of justice, 1952 rackeetering, 1956 laundering of monetary instruments,

1957 monetary transaction derived from specified unlawful activity, and 29 USC 186 501c – fraud connected with a case under title 11, fraud in the sale of securities.

## COUNT FOUR
Conspiracy

19.     Plaintiff incorporates by reference all of the preceding paragraphs as though set Forth fully herein.

20.     For years, each of these defendants have conspired with each other to scam and defraud professionals and companies throughout the United States and other countries around the world.

21.     Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

22.     Defendants, and each of them, did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged scam.

23.     Defendants, and each of them, furthered the conspiracy by cooperation with each other, took action to further the conspiracy as outlined above, and lent aid and encouragement to and ratified the conduct of the other defendants herein.

24.     As a direct and proximate result of the conspiracy of these defendants, each of the plaintiffs were severely wronged and damaged, both financially, emotionally and reputation wise. Plaintiffs are entitled to compensatory damages at trial in an amount to be determined by the enlightened conscious of an impartial jury.

25.     Defendants did the things herein alleged maliciously and to oppress plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined by the enlightened conscience of an impartial jury at trial.

## COUNT FIVE
Fraud, Generally

26.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

27.     These defendants, and each of them, made numerous statements, representations and claims to each Plaintiff.

28.     Each of the plaintiffs relied on the defendants' statements and representations to their own detriment. For example, and without limiting the damages in any way, Plaintiffs FERGUSON and ROTHENBERG relied upon the defendants' false statements in their dealings with Winterhawk, as outlined above and in footnotes. This reliance caused these particular plaintiffs severe financial damage, destructive damage to reputations and painful emotional distress.

29.     When the defendants made these representations each of them knew them to be false, and these representations were made by defendants with the intent to defraud and deceive plaintiffs and with the intent to induce plaintiffs to act in the manner herein alleged. At the time defendants made the promises to plaintiffs, defendants had no intention of performing them.

30.     Plaintiffs, at the time these representations were made by defendants and at the time plaintiffs took the actions herein alleged, were ignorant of the falsity of each defendants' representations and believed them to be true and could not, in the exercise of reasonable diligence, have discovered defendants' secret intention. In reliance on these representations, plaintiffs were induced to and did act with others to their detriment. Had plaintiffs known the actual facts, they would not have taken such action. Plaintiffs' reliance on defendant's representations was justified and caused each severe harm and damage.

31.     As a proximate result of each defendants' fraud and deceit and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

32.     Defendants did the things herein alleged maliciously and to oppress plaintiffs.

Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined by the enlightened conscience of an impartial jury at trial.

## COUNT SIX
### Wire Fraud

33.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

34.     Each of these defendants have committed wire fraud in violation of 18 U.S.C. §1343 by having devised a scheme or artifice to defraud these defendants, for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, e-mails and other documents for the purpose of executing their fraudulent scheme.

35.     When the defendants made these representations by wire each of them knew them to be false, and these representations were made by defendants with the intent to defraud and deceive plaintiffs and with the intent to induce plaintiffs to act in the manner herein alleged. At the time defendants made the promises to plaintiffs, defendants had no intention of performing them.

36.     As a proximate result of each defendants' fraud and deceit and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

37.     Defendants did the things herein alleged maliciously and to oppress plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined by the enlightened conscience of an impartial jury at trial.

## COUNT SEVEN
Mail Fraud

38.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

39.     Each of these defendants have committed mail fraud in violation of 18 U.S.C. §1341 by having devised their scheme and artifice to defraud, for obtaining money or property by means of false or fraudulent pretenses, representations, or promises from these plaintiffs, and placed in the post office or authorized depository for mail matter, items to be sent or delivered by the Postal Service, knowing the same to be fraudulent.

40.     When the defendants made these representations by mail each of them knew them to be false, and these representations were made by defendants with the intent to defraud and deceive plaintiffs and with the intent to induce plaintiffs to act in the manner herein alleged. At the time defendants made the promises to plaintiffs, defendants had no intention of performing them.

41.     As a proximate result of each defendants' fraud and deceit and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

42.     Defendants did the things herein alleged maliciously and to oppress plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined by the enlightened conscience of an impartial jury at trial.

## COUNT EIGHT
Securities Fraud

43.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

44.     Each of these defendants has committed Securities Fraud, as contemplated in 15 U.S.C. § 77a, et seq.

45.     These defendants employed schemes to defraud and deceive these plaintiffs. As such, these defendants are civilly liable to the plaintiffs for damages as  authorized by the

above mentioned statute.

46.     As a proximate result of each defendants' fraud and deceit and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

47.     Defendants did the things herein alleged maliciously and to oppress plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined by the enlightened conscience of an impartial jury at trial.

**<u>COUNT NINE</u>**
Intentional Infliction of Emotional Distress

48.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

49.     Each of these defendants acted in an intentional and malicious manner and acted so for the purpose of causing Plaintiffs to suffer humiliation, mental anguish, and emotional and physical distress.

50.     Because of the intentional actions of the defendants, and each of them, the plaintiffs' reputations have been besmirched and destroyed, businesses crippled, an election lost and good will wrecked.

51.     The defendants' intentional actions have led to law suits being filed against the plaintiffs, investigations being launched into several of the plaintiffs, all of which would never have happened but for the intentional fraud perpetrated upon the plaintiffs by these defendants.

52.     As a proximate result of each defendants' fraud and deceit and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

53.     Defendants did the things herein alleged maliciously and to oppress plaintiffs. Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined by the enlightened conscience of an impartial jury at trial.

COMPLAINT FOR DAMAGES

## COUNT TEN
Unjust Enrichment

54.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

55.     These defendants have unjustly enriched themselves, and attempted to further enrich themselves, to the detriment of the plaintiffs by taking their money, by inducing them to rely on their promises through fraudulent documents and other deceitful means as described above.

56.     As a proximate result of each defendants' conduct and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

## COUNT ELEVEN
False Light Privacy Violation

57.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

58.     As a direct result of these defendants' deceptive, false and fraudulent actions, the plaintiffs have been cast in a false light, and have been portrayed as something they are not.

59.     These actions have caused the plaintiffs extreme humiliation, embarrassment, damage to reputation, mental anguish and physical and emotional distress

60.     As a proximate result of each defendants' conduct and the facts herein alleged, plaintiffs have been damaged in an amount to be determined by the enlightened conscious of an impartial jury at trial.

## COUNT TWELVE
Breach of Contract

61.     Plaintiffs incorporate by reference all of the preceding paragraphs as though set Forth fully herein.

62.     These defendants entered into contracts with the plaintiffs which they had no intention of fulfilling.

63.     The defendants did not perform on a single contractual promise made to the plaintiffs.

64.     The defendants are therefore in breach of contract, with damages to be determined by the enlightened conscience of an impartial jury at trial.


## PRAYER

WHEREFORE, Plaintiffs prays for judgment against Defendants, and each of them as follows:

1.     For compensatory and treble damages for the defendants' RICO violations in an amount to be determined by a jury at trial;

2.     For compensatory and punitive damages for each and every count of the complaint in an amount to be determined by a jury at trial;

3.     That summons and process issue and defendants be served with the same as provided by law;

4.     For trial by jury;

5.     For all such other and further relief that this Court deems just and proper.


Respectfully submitted,

BOYD LAW GROUP, LLC

Dated:          May 11, 2012


/S/ Michael L. Rothenberg

_____

MICHAEL L. ROTHENBERG
*Individually and as counsel for*
*Plaintiff MATTHEW FERGUSON*
Georgia Bar No. 615671


3325 Paddocks Parkway
Suite 140
Suwanee, Georgia 30024
(770) 529-3476

COMPLAINT FOR DAMAGES